1    BLOOD HURST & O'REARDON, LLP
     TIMOTHY G. BLOOD (149343)
2    JENNIFER L. MACPHERSON (202021)
     501 West Broadway, Suite 1490
3    San Diego, CA  92101
     Tel: 619/338-1100
4    619/338-1101 (fax)
     tblood@bholaw.com
5    jmacpherson@bholaw.com

6    BARNOW AND ASSOCIATES, P.C.
     BEN BARNOW (*pro hac vice forthcoming*)
7    ANTHONY L. PARKHILL (*pro hac vice forthcoming*)
     205 West Randolph Street, Suite 1630
8    Chicago, IL  60606
     Tel: 312/621-2000
9    b.barnow@barnowlaw.com
     aparkhill@barnowlaw.com
10
     Attorneys for Plaintiffs and the Putative Class
11

12              **UNITED STATES DISTRICT COURT**

13              **EASTERN DISTRICT OF CALIFORNIA**

14   CATHERINE O'CONNOR and            Case No.
     FRANK COATS, individually, and on
15   behalf of all others similarly situated,
                                       **CLASS ACTION**
16              Plaintiff,

17        v.                            **CLASS ACTION COMPLAINT**

18   SUTTER HEALTH; WELLTOK, INC.;
     PROGRESS SOFTWARE
19   CORPORATION; and IPSWITCH,
     INC.,
20
                Defendants.
21                                      **DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

00208825

1  Plaintiffs Catherine O'Connor and Frank Coats ("Plaintiffs"), on behalf of
2  themselves and all others similarly situated (collectively, "Class members"), by and
3  through their attorneys, bring this Class Action Complaint against Sutter Health
4  ("Sutter"), Welltok, Inc. ("Welltok"), Progress Software Corporation ("PSC"), and
5  Ipswitch, Inc. ("Ipswitch") (collectively, "Defendants") and complain and allege upon
6  personal knowledge as to themselves and information and belief as to all other
7  matters.

8  **INTRODUCTION**

9  1.  Plaintiffs bring this class action against Defendants for their failure to
10 secure and safeguard their and approximately 845,441 other similarly situated
11 individuals' personally identifiable information ("PII") and personal health
12 information ("PHI"), including but not limited to names, addresses, telephone
13 numbers, email addresses, Medicare/Medicaid ID numbers, certain health insurance
14 plan or group names, provider names, prescription names, and treatment codes.

15 2.  Sutter is a large healthcare system based in Sacramento, California.
16 Sutter contracts with Welltok to provide communications to its patients and shares its
17 patients' PII/PHI with Welltok. Welltok transferred Sutter's patients' PII/PHI through
18 Ipswitch and PSC's MOVEit Transfer software. Plaintiffs' and Class members'
19 PII/PHI was disclosed to unauthorized third parties during a massive data breach
20 compromising the MOVEit Transfer and MOVEit Cloud ("MOVEit") software that
21 occurred between approximately May 30, 2023, and May 31, 2023 (the "Data
22 Breach").

23 3.  During the Data Breach, and due to Defendants' data security and
24 privacy shortcomings, unauthorized persons were able to gain access to files
25 containing the PII/PHI of Sutter's patients by exploiting a vulnerability in the
26 MOVEit platform.

27 4.  Defendants owed a duty to Plaintiffs and Class members to implement
28 and maintain reasonable and adequate security measures to secure, protect, and

BLOOD HURST & O' REARDON, LLP

safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their PII/PHI from unauthorized access and disclosure.

5.      As a result of Defendants' inadequate security measures and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all of Sutter's patients whose PII/PHI was exposed as a result of the Data Breach.

6.      Plaintiffs, on behalf of themselves and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, violations of the California Confidentiality of Medical Information Act, and violations of the California Unfair Competition Law, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### Plaintiff Catherine O'Connor

7.      Plaintiff Catherine O'Connor is a citizen of California.

8.      Plaintiff O'Connor was required to provide her PII/PHI to Sutter in connection with obtaining healthcare or other services.

9.      Based on representations made by Sutter and relied upon by Plaintiff O'Connor, Plaintiff O'Connor believed that Sutter had implemented and maintained reasonable security and practices to protect her PII/PHI, including ensuring third parties it contracts with and shares PII/PHI with maintain adequate data security and practices.

10.     In connection with providing healthcare or other services to Plaintiff O'Connor, Sutter collected, maintained, and shared Plaintiff O'Connor's PII/PHI on its systems and to its vendors, including Welltok.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

11.    Had Plaintiff O'Connor known that Defendants do not adequately protect the PII/PHI in their possession, including Sutter and Welltok by not ensuring that the third parties they contract with maintain adequate data security systems and practices, she would not have agreed to provide her PII/PHI to Sutter.

12.    Plaintiff O'Connor received a letter from Welltok notifying her that her PII/PHI was exposed in the Data Breach.

13.    As a direct result of the Data Breach, Plaintiff O'Connor has suffered injury and damages including, *inter alia*: a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; and overpayment for services that did not include adequate data security.

***Plaintiff Frank Coats***

14.    Plaintiff Frank Coats is a citizen of California.

15.    Plaintiff Coats was required to provide his PII/PHI to Sutter in connection with obtaining healthcare or other services.

16.    Based on representations made by Sutter and relied upon by Plaintiff Coats, Plaintiff Coats believed that Sutter had implemented and maintained reasonable security and practices to protect his PII/PHI, including ensuring third parties it contracts with and shares PII/PHI with maintain adequate data security and practices.

17.    In connection with providing healthcare or other services to Plaintiff Coats, Sutter collected, maintained, and shared Plaintiff Coats's PII/PHI on its systems and to its vendors, including Welltok.

18.    Had Plaintiff Coats known that Defendants do not adequately protect the PII/PHI in their possession, including Sutter and Welltok by not ensuring that the third parties they contract with maintain adequate data security systems and practices, he would not have agreed to provide his PII/PHI to Sutter.

BLOOD HURST & O' REARDON, LLP

3

00208825

19.     Plaintiff Coats received a letter from Welltok notifying him that his PII/PHI was exposed in the Data Breach.

20.     As a direct result of the Data Breach, Plaintiff Coats has suffered injury and damages including, *inter alia*: a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; deprivation of the value of his PII/PHI; and overpayment for services that did not include adequate data security.

### Defendant Sutter Health

21.     Defendant Sutter Health is a California nonprofit corporation with its principal place of business located at 2200 River Plaza Drive, Sacramento, CA 95833.

### Defendant Welltok, Inc.

22.     Defendant Welltok, Inc. is a Delaware corporation with its principal place of business located at 75 Fountain St., Suite 310, Providence, RI 02902.

### Defendant Progress Software Corporation

23.     Defendant Progress Software Corporation is a Delaware corporation with a principal place of business located at 15 Wayside Road, Suite 4, Burlington, MA 01803.

### Defendant Ipswitch, Inc.

24.     Defendant Ipswitch, Inc. is a Massachusetts for profit corporation with its principal place of business located at 15 Wayside Road, 4th Floor, Burlington, MA 01803.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

26.     The Court has personal jurisdiction over Defendant Sutter Health because it is a California corporation, has its principal place of business in California, and transacts significant business in California.

27.     The Court has personal jurisdiction over Defendants Welltok, Inc., Ipswitch, Inc., Progress Software Corporation because Defendants transact significant business in California, and otherwise have sufficient minimum contacts with and intentionally avail themselves of the markets in California through their promotion, marketing, and sale of products and services.

28.     Venue properly lies in this judicial district because, *inter alia,* Sutter's principal place of business is located in this District, Defendants transact substantial business in this District, and a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District.

## **FACTUAL ALLEGATIONS**

### *Ipswitch, Inc., Progress Software, and the Unsecure MOVEit Software*

29.     Ipswitch is an IT software development company founded in 1991 in Burlington, Massachusetts. Ipswitch sells its software and related products and services, including MOVEit solutions, directly and through resellers and distributors in the United States.

30.     Defendant PSC, a public domestic software company based in Massachusetts, acquired Ipswitch in May 2019 for approximately $225 million.

31.     Ipswitch developed and through PSC sells the MOVEit software, which they claim is "the leading secure Managed File Transfer (MFT) software used by thousands of organizations around the world to provide complete visibility and control over file transfer activities."[1]

---

[1]     *MOVEit*, IPSWITCH, https://www.ipswitch.com/moveit (last accessed Sep. 1, 2023).

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00208825

32.     On their websites, Defendants Ipswitch and PSC make a host of claims about data security and their MOVEit product. Ipswitch claims, generally, that its "Enterprise File Transfer Solutions – Mak[e] the networked world a safer place."[2] Its website states: "Our efficient, easy-to-use products empower customers to respond faster to business demands through accelerated implementation and improved productivity and security."[3]

33.     Specific to MOVEit, Ipswitch claims that "MOVEit enables your organization to meet compliance standards, easily ensure the reliability of core business processes, and secure the transfer of sensitive data between partners, customers, users and systems." [4] Ipswitch claims its MOVEit Transfer and MOVEit Cloud products give customers "control" over their businesses; "provides full security, reliability and compliance"; provide "encryption, security, activity tracking tamper-evident logging, and centralized access controls to meet your operational requirements"; "[r]eliably and easily comply with SLAs, internal governance requirements and regulations like PCI, HIPAA, CCPA/CPRA and GDPR"; and provide "secure and managed file transfer."[5]

34.     PSC makes similar statements about data security. Its website claims "MOVEit provides secure collaboration and automated file transfers of sensitive data" and that it provides "[e]ncryption and activity tracking enable compliance with regulations such as PCI, HIPAA and GDPR."[6]

---

[2]     *Ipswitch.com*, IPSWITCH, https://www.ipswitch.com (last accessed Sep. 1, 2023).
[3]     *Id.*
[4]     *See MOVEit*, *supra* note 1.
[5]     *Id.*
[6]     *MOVEit*, PSC, https://www.progress.com/moveit (last accessed Sep. 1, 2023).

CLASS ACTION COMPLAINT

BLOOD HURST & O'REARDON, LLP

00208825

35.     PSC also touts all of the following on its website regarding MOVEit:[7]

# Securely Share Files Across the Enterprise and Globally

Reduce the risk of data loss and non-compliance with a fully-auditable and managed file transfer solution. Extend file transfer capabilities to all users to eliminate insecure use of email and quickly onboard partners and third-parties. Easily create automated file transfer tasks and workflows to accelerate your business and eliminate the risk of user error. Track and report on every single transfer.

✓ **Transfer Sensitive Information Securely**

Encryption in-transit and at-rest and advanced security features keep sensitive information out of harm's way.

✓ **Assure Regulatory Compliance**

Easily implement security controls and establish an audit trail.

✓ **Let End Users Collaborate Securely**

Easily ensure secure and compliant sharing of sensitive data for all users.

✓ **Accelerate Task and Workflow Creation**

Enable your team with programming-free automation of multi-step, logic-based workflows.

36.     As demonstrated above, Defendants Ipswitch and PSC heavily tout and promote the MOVEit products and services as capable of safely transferring sensitive information. Despite these assurances and claims, Defendants Ipswitch and PSC failed to offer safe and secure file transfer products and failed to adequately protect Plaintiffs' and Class members' PII.

37.     This is because the products that Defendants Ipswitch and PSC offered, and which Welltok used, were not secure. When the Data Breach occurred, there was a critical vulnerability in the MOVEit software referred to as CVE-2023-34362. Specifically, Defendants Ipswitch and PSC identified that MOVEit's web-based front end is affected by a critical structured query language (SQL) injection vulnerability/attack vector that can be exploited by an unauthenticated attacker to access databases associated with the product.

38.     All of the Defendants knew or should have known that MOVEit leaves the PII/PHI of Sutter's patients, including Plaintiffs and Class members, exposed to security threats. Despite this, Ipswitch and PSC continued to offer MOVEit file

---

[7]     *Id.*

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

transfer products without adequately testing and identifying the vulnerabilities in the products, and patching or otherwise eliminating those threats.

39.     Similarly, Welltok continued to use the MOVEit software without adequately ensuring it was secure and that Ipswitch and PSC had adequate data security systems and practices in place to protect Plaintiffs and Class members' PII/PHI. As one cybersecurity company noted, "Just because a piece of software claims to be 'secure' doesn't mean that it is. Customers must always validate that the software they use is secure, and is configured in a way that can protect against cyberattacks."[8]

### Sutter and Welltok

40.     Sutter claims to provide healthcare to "more than 3 million Californians."[9] The company has over 51,000 employees and 22 hospitals, among other locations.[10]

41.     According to its notice letter, Welltok "operates an online contact-management platform that enables healthcare clients to provide patients and members with important notices and communications."[11]

42.     Sutter maintains a privacy policy on its website that states, "Federal and state laws require Sutter Health to protect your health information . . . ."[12] The privacy

---

[8]     Avishai Avivi, *MOVEit Vulnerability: A Painful Reminder That Threat Actors Aren't the Only Ones Responsible for a Data Breach*, SAFEBREACH (June 21, 2023), https://www.safebreach.com/moveit-vulnerability-a-painful-reminder-that-threat-actors-arent-the-only-ones-responsible-for-a-data-breach/.

[9]     *What is Sutter Health*, SUTTER HEALTH, https://www.sutterhealth.org/about/what-is-sutter-health (last accessed Nov. 16, 2023).

[10]     *Id.*

[11]     *Patient Notification Letter*, WELLTOK, https://oag.ca.gov/system/files/Welltok%20Patient%20Notification%20Letter_Redacted.pdf (last accessed Nov. 16, 2023).

[12]     *HIPAA and Privacy Practices*, SUTTER HEALTH, https://www.sutterhealth.org/privacy/hipaa-privacy (last accessed Nov. 16, 2023).

BLOOD HURST & O' REARDON, LLP

8

00208825

policy also states, "We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[13]

43.     Sutter's Patient Rights and Responsibilities also discusses privacy, stating that patients have a right to "[c]onfidential treatment of all communications and records pertaining to your care and stay in the hospital."[14]

44.     Sutter shared Plaintiffs' and Class members' PII/PHI with Welltok, who then shared the PII/PHI with Ipswitch and PSC via the MOVEit software in connection with providing services to Plaintiffs and Class members.[15] In doing so, Sutter failed to ensure that Welltok would adequately protect its patients' PII/PHI and Welltok failed to ensure that Ipswitch and PSC implemented and maintained adequate data security practices to protect Plaintiffs' and Class member's PII/PHI from unauthorized access, disclosure, and theft.

### The Data Breach

45.     On or about May 30, 2023, unauthorized persons exploited a vulnerability in the MOVEit software to access and download files containing the sensitive PII/PHI of Plaintiffs and Class members.[16]

46.     According to reports, the Clop (also known as CLOP or Cl0p) ransomware gang is responsible for the attack on the MOVEit platform.[17]

---

[13]     *Id.*

[14]     *Patient Rights and Responsibilities*, SUTTER HEALTH, https://www.sutterhealth.org/for-patients/patient-rights-responsibilities (last accessed Nov. 16, 2023).

[15]     *See Patient Notification Letter*, *supra*, n. 11.

[16]     *Id.*

[17]     *See Clop Gang to Earn Over $75 Million from MOVEit Extortion Attacks*, Bleeping Computer (July 21, 2023, 12:34 PM), https://www.bleepingcomputer.com/news/security/clop-gang-to-earn-over-75-million-from-moveit-extortion-attacks/.

BLOOD HURST & O' REARDON, LLP

00208825

47.     On or about July 26, 2023, Welltok learned of the Data Breach. Despite this, Welltok waited until approximately October 31, 2023, over two months later, to begin notifying its customers of the Data Breach.[18]

48.     Welltok's notice states that the information affected for each person may vary, but the information affected in the Data Breach includes "name and address, telephone number, email address . . . Social Security Numbers, Medicare/Medicaid ID Numbers, [] certain Health Insurance information such as plan or group name . . . provider name, prescription name, or treatment code."[19] The notice on Sutter's website conflicts with this, stating that Welltok "can confirm social security numbers and financial information were not impacted by this incident," but does not list what information was affected.[20]

49.     The Cybersecurity and Infrastructure Security Agency (CISA) and the FBI first warned on June 7, 2023, that the Clop ransomware gang was exploiting a vulnerability in MOVEit Transfer. "Internet-facing MOVEit Transfer web applications were infected with a specific malware used by CL0P, which was then used to steal data from underlying MOVEit Transfer databases," the advisory said, as it explained how threat actors carried out the attack.[21]

---

[18]     *See Patient Notification Letter*, *supra*, n. 11.

[19]     *Notice of Data Privacy Event*, WELLTOK, https://welltoknotice.wpenginepowered.com/?page_id=23 (last accessed Nov. 16, 2023).

[20]     *Sutter Health Vendor Reports Patient Information Incident*, Sutter Health (Nov. 3, 2023), https://vitals.sutterhealth.org/sutter-health-vendor-reports-patient-information-incident/.

[21]     Bruce Sussman, *Clop Ransomware and the MOVEit Cyberattack: What to Know*, BLACKBERRY BLOG (June 19, 2023), https://blogs.blackberry.com/en/2023/06/clop-ransomware-and-moveit-cyberattack.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00208825

50.    A senior CISA officer informed reporters that "several hundred" businesses and organizations in the United States may be impacted by the hacking campaign in addition to government entities.[22]

51.    As a result of the MOVEit Data Breach, Plaintiffs and Class members have had their sensitive PII/PHI exposed as a result of Ipswitch and PSC's unsecure MOVEit file transfer product being exploited by cyber criminals during the Data Breach, and because Sutter and Welltok failed to ensure the third parties they contract with maintained adequate data security systems and practices.

### *Defendants Knew that Criminals Target PII*

52.    At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from cyber-attacks that Defendants should have anticipated and guarded against.

53.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[23]

---

[22]    Onur Demirkol, *US Government Under Seige: MOVEit Breach Exposes Critical Data to Ruthless Clop Ransomware Attack*, DATA CONOMY (June 19, 2023), https://dataconomy.com/2023/06/19/moveit-breach-data-clop-ransomware/ (last accessed Nov. 16, 2023).

[23]    Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

BLOOD HURST & O' REARDON, LLP

11

00208825

54.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2023 report, the healthcare compliance company Protenus found that there were 956 medical data breaches in 2022 with over 59 million patient records exposed.[24] This is an increase from the 758 medical data breaches which exposed approximately 40 million records that Protenus compiled in 2020.[25]

55.     PII/PHI is a valuable property right.[26] The value of PII/PHI as a commodity is measurable.[27] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[28] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[29] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

56.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various internet websites making the

---

[24]    *See 2023 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last accessed Nov. 15, 2023).

[25]    *See id.*

[26]    *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data

[27]    *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[28]    OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[29]    IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00208825

information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

57.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[30] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[31]

58.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[32] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[33]

59.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[34] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare

[30]    *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[31]    *Id.*
[32]    *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[33]    *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[34]    Steager, *supra*, n. 29.

BLOOD HURST & O' REARDON, LLP

00208825

information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[35]

60.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[36]

61.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

62.    Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[37][38]

63.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by,

---

[35]    *Id.*

[36]    Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[37]    *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 15, 2023).

[38]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

BLOOD HURST & O' REARDON, LLP

among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[39]

64.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[40]

65.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[41] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[42] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[43] The FTC also warns, "If the thief's health information is mixed with

---

[39]    *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[40]    Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 15, 2023).

[41]    Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[42]    *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra*, n. 32.

[43]    *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 15, 2023).

15

yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[44]

66.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

    a.    Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

    b.    Significant bills for medical goods and services neither sought nor received.

    c.    Issues with insurance, co-pays, and insurance caps.

    d.    Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

    e.    Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

    f.    As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

    g.    Phantom medical debt collection based on medical billing or other identity information.

    h.    Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [45]

67.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used.

---

[44]    *Id*.
[45]    *See* Dixon & Emerson, *supra*, n. 40.

BLOOD HURST & O' REARDON, LLP

00208825

1   On average it takes approximately three months for consumers to discover their

2   identity has been stolen and used, but it takes some individuals up to three years to

3   learn that information.[46]

4                                    *Damages Sustained by Plaintiffs and Class Members*

5           68.    Plaintiffs and Class members have suffered and will suffer injury,

6   including, but not limited to: (i) a substantially increased and imminent risk of identity

7   theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket

8   expenses associated with the prevention, detection, and recovery from unauthorized

9   use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to

10  mitigate the actual and future consequences of the Data Breach; (v) the continued risk

11  to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms

12  of time, effort, and money that will be required to prevent, detect, and repair the

13  impact of the PII/PHI compromised as a result of the Data Breach; and

14  (vii) overpayment for services that were received without adequate data security.

15                                      **CLASS ALLEGATIONS**

16          69.    This action is brought and may be properly maintained as a class action

17  pursuant to Federal Rule of Civil Procedure 23.

18          70.    Plaintiffs bring this action on their own behalf, and on behalf of the

19  following Class of similarly situated persons:

20          All persons whose personally identifiable information and personal
            health information was provided to Sutter Health and Welltok and was
21          accessed in the Data Breach by unauthorized persons, including all who
22          were sent a notice of the Data Breach.

23          71.    Excluded from the Class are: (i) Defendant Ipswitch, Inc. and its

24  affiliates, parents, subsidiaries, officers, agents, directors, legal representatives,

25  successors, subsidiaries, and assigns; (ii) Defendant Progress Software Corporation

26

27  ---
    [46]   John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF
28  SYSTEMICS,        CYBERNETICS        AND       INFORMATICS         9     (2019),
    http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

00208825

1  and its affiliates, parents, subsidiaries, officers, agents, directors, legal
2  representatives, successors, subsidiaries, and assigns; (iii) Defendant Sutter Health
3  and its affiliates, parents, subsidiaries, officers, agents, directors, legal
4  representatives, successors, subsidiaries, and assigns; (iv) Defendant Welltok, Inc.
5  and its affiliates, parents, subsidiaries, officers, agents, directors, legal
6  representatives, successors, subsidiaries, and assigns; and (v) the judge(s) presiding
7  over this matter and the clerks of said judge(s).

8      72.    Certification of Plaintiffs' claims for class-wide treatment is appropriate
9  because Plaintiffs can prove the elements of their claims on a classwide basis using
10 the same evidence as would be used to prove those elements in individual actions
11 alleging the same claims.

12     73.    The members of the Class are so numerous that joinder of all Class
13 members in a single proceeding would be impracticable. Sutter has reported the
14 number of persons affected by the Data Breach as 845,441 persons.[47]

15     74.    Common questions of law and fact exist as to all Class members and
16 predominate over any potential questions affecting only individual Class members.
17 Such common questions of law or fact include, *inter alia*:

    a.    Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure, including ensuring that the third parties it contracts with to provide services had adequate data security measures in place;

    b.    Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PHI;

    c.    Whether an implied contract existed between Class members and Sutter, providing that Sutter would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

---

[47] *See Sutter Health Vendor Reports Patient Information Incident*, *supra*, n. 20.

BLOOD HURST & O' REARDON, LLP

00208825

d.     Whether Defendants breached their duties to protect Plaintiffs' and Class members' PII/PHI; and

e.     Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

75.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

76.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

77.     Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

78.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

00208825

expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

79.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

80.   Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in their possession, custody, or control.

81.   Defendants knew or should have known the risks of collecting and storing Plaintiffs' and Class members' PII/PHI and the importance of maintaining secure systems, including ensuring third party vendors employed adequate data security practices. Defendants knew or should have known that they faced an increased threat of customer data theft, as judged by the many data breaches that have targeted companies that stored PII/PHI in recent years.

82.   Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they collect, store, and maintain, and the resources at their disposal, Defendants should have taken care to identify the vulnerabilities to their systems or to their third-party vendors' systems and prevented the Data Breach from occurring.

83.   Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiffs' and Class members' PII/PHI.

BLOOD HURST & O' REARDON, LLP

00208825

84.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

85.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

86.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) loss of value of the PII/PHI that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

## COUNT II

## NEGLIGENCE PER SE

87.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

BLOOD HURST & O' REARDON, LLP

88. Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

89. Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

90. Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA, by failing to, or contracting with companies that failed to, use reasonable measures to protect Plaintiffs' and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

91. Defendants' violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

92. Plaintiffs and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

93. The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security

measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Brach.

94.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

95.    The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Defendants' violations of harm the HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III

## BREACH OF FIDUCIARY DUTY

### Against Sutter

96.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

97.     Plaintiffs bring this claim only against Sutter, individually and on behalf of all Class members.

98.     Plaintiffs and Class members gave Sutter their PII/PHI in confidence, believing that Sutter would protect that information. Plaintiffs and Class members would not have provided Sutter with this information had they known it would not be adequately protected.

99.     Sutter's acceptance and storage of Plaintiffs' and Class members' PII/PHI created a fiduciary relationship between Sutter and Plaintiffs and Class members. In light of this relationship, Sutter must act in good faith primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiffs' and Class members' PII/PHI.

100.    Due to the nature of the relationship between Sutter and Plaintiffs and Class members, Plaintiffs and Class members were entirely reliant upon Sutter to ensure that their PII/PHI was adequately protected. Plaintiffs and Class members had no way of verifying or influencing the nature and extent of Sutter's data security policies and practices or the extent to which it ensured that the third parties it contracts with and shares PII/PHI with maintained adequate data security practices and protocols, and Sutter was in an exclusive position to guard against the Data Breach.

101.    Sutter has a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of their relationship. It breached that duty by, among other things, failing to properly safeguard Plaintiffs' and Class members' PII/PHI that it collected, failing to ensure Plaintiffs' and Class members' PII/PHI was shared with entities with adequate data protection systems and measures in place, and failing to notify Plaintiffs and Class members of the Data Breach in a timely manner.

102.    As a direct and proximate result of Sutter's breaches of its fiduciary duties, Plaintiffs and Class members have suffered and will suffer injury,

BLOOD HURST & O' REARDON, LLP

00208825

including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### Against Sutter

103.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

104.  Plaintiffs bring this claim only against Sutter, individually and on behalf of all Class members.

105.  In connection with receiving healthcare services, Plaintiffs and Class members entered into implied contracts with Sutter.

106.  Pursuant to these implied contracts, Plaintiffs and Class members paid money to Sutter, directly or through their insurance, and provided Sutter with their PII/PHI. In exchange, Sutter agreed to, among other things, and Plaintiffs and Class members understood that Sutter would: (1) provide services to Plaintiffs and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII/PHI; and (3) protect Plaintiffs' and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

107.  The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and Sutter, on

BLOOD HURST & O' REARDON, LLP

00208825

the other hand. Indeed, as set forth *supra*, Sutter recognized the importance of data security and the privacy of Sutter's patients' PII/PHI. Had Plaintiffs and Class members known that Sutter would not adequately protect their PII/PHI, they would not have received healthcare or other services from Sutter.

108.   Plaintiffs and Class members performed their obligations under the implied contract when they provided Sutter with their PII/PHI and paid for healthcare or other services from Sutter.

109.   Sutter breached its obligations under its implied contracts with Plaintiffs and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, including by ensuring companies it contracts with implement and maintain reasonable security measures to protect PII/PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

110.   Sutter's breach of its obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class members have suffered from the Data Breach.

111.   Plaintiffs and all other Class members were damaged by Sutter's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face

and will continue to face; and (vii) overpayment for services that were received without adequate data security.

<div align="center">

**COUNT V**

**UNJUST ENRICHMENT**

</div>

112. Plaintiffs reallege and incorporates by reference all preceding paragraphs as if fully set forth herein.

113. This claim is pleaded in the alternative to Plaintiffs' breach of implied contract claim.

114. Plaintiffs and Class members conferred a monetary benefit upon Defendants in the form of their valuable PII/PHI and through money paid for services, a portion of which Plaintiffs and Class members reasonably expected would be used to protect their PII/PHI.

115. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiffs and Class members by storing or transferring the PII/PHI, or otherwise using it to facilitate their business, and providing services to Plaintiffs and Class members.

116. As a result of Defendants' conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the loss of value of Plaintiffs' and Class members' PII/PHI. Plaintiffs and Class members also suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

117. Defendants should not be permitted to retain the money belonging to Plaintiffs and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards. Defendants should be compelled to provide for the benefit of

<div align="center">27</div>

Plaintiffs and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## COUNT VI

## CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT
## Cal. Civ. Code §§ 56, *et seq*.

118.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

119.   California's Confidentiality of Medical Information Act ("CMIA") requires a healthcare provider "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information [to] do so in a manner that preserves the confidentiality of the information contained therein." Cal. Civ. Code § 56.101. "Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." *Id.*

120.   The CMIA further requires that "[a]n electronic health record system or electronic medical record system . . . [p]rotect and preserve the integrity of electronic medical information." Cal. Civ. Code § 56.101(b)(1)(A).

121.   Plaintiffs and Class members are "patient[s]," "whether or not still living, who received health care services from a provider of health care and to whom medical information pertains" pursuant to § 56.05(l) of the CMIA.

122.   Defendants are each a "provider of health care" pursuant to § 56.05(o) and § 56.06 of the CMIA.

123.   Defendants are subject to the requirements and mandates of the CMIA and are therefore required to do the following under the CMIA:

a.   Ensure that medical information regarding patients is not disclosed or disseminated or released without patients' authorization, and to protect and preserve the confidentiality of the medical information regarding a patient, under

BLOOD HURST & O' REARDON, LLP

Cal. Civ. Code §§ 56.10, 56.13, 56.245, 56.26, and 56.101;

b.      Not disclose medical information regarding a patient without first obtaining an authorization under Cal. Civ. Code §§ 56.10, 56.13, 56.20, 56.245, 56.26, and 56.35;

c.      Create, maintain, preserve, and store medical records in a manner that preserves the confidentiality of the information contained therein under Cal. Civ. Code § 56.101(a);

d.      Protect and preserve confidentiality of electronic medical information in their possession under Cal. Civ. Code § 56.101(b)(1)(A); and

e.      Take appropriate preventive actions to protect confidential information or records from unauthorized release under Cal. Civ. Code § 56.36(e)(2)(E).

124.   The PII/PHI of Plaintiffs and Class members compromised in the Data Breach constitutes "medical information" maintained in electronic form pursuant to § 56.05(i) of the CMIA.

125.   Due to Defendants' negligent creation, maintenance, preservation, or storage of Plaintiffs' and Class members' PII/PHI, Defendants allowed Plaintiffs' and Class members' individually identifiable medical information to be accessed and actually viewed by at least one unauthorized third party, constituting a release in violation of Cal. Civ. Code § 56.101(b)(1)(A).

126.   Defendants disclosed "medical information," as defined in CMIA, Cal. Civ. Code § 56.05(i), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). Plaintiffs and Class members did not authorize Defendants' disclosure and release of their PII/PHI that occurred in the Data Breach.

127.   Defendants' negligent failure to maintain, preserve, store, abandon, destroy, or dispose of Plaintiffs' and Class members' medical information in a manner that preserved the confidentiality of the information contained therein violated the CMIA, Cal. Civ. Code § 56.101(a). Sutter transmitted patients' PII/PHI to Welltok,

BLOOD HURST & O' REARDON, LLP

00208825

1    who then allowed PSC and Ipswitch access to the PII/PHI through the MOVEit

2    transfer software. That information was then accessed, viewed, and exfiltrated by an

3    unauthorized third party or parties, and thus Defendants negligently released medical

4    information concerning Plaintiffs and Class members. Accordingly, Defendants'

5    systems and protocols did not protect and preserve the integrity of electronic medical

6    information in violation of the CMIA, Cal. Civ. Code § 56.101.

7        128.   Defendants violated the CMIA by negligently (1) failing to implement

8    reasonable administrative, physical and technical safeguards to protect, secure and

9    prevent the unauthorized access to, and acquisition of, Plaintiffs' and Class members'

10   PII/PHI; (2) failing to implement reasonable data security measures, such as intrusion

11   detection processes that detect data breaches in a timely manner, to protect and secure

12   Plaintiffs' and Class members' PII/PHI; (3) failing to properly vet prospective

13   vendors for data security practices; and (4) allowing undetected and unauthorized

14   access to servers, networks, and systems where Plaintiffs' and Class members'

15   PII/PHI was kept.

16       129.   Defendants' failure to implement adequate data security measures to

17   protect the PII/PHI of Plaintiffs and Class members was a substantial factor in

18   allowing unauthorized parties to access the MOVEit software and acquire the PII/PHI

19   of Plaintiffs and Class members.

20       130.   As a direct and proximate result of Defendants' violation of the CMIA,

21   Defendants allowed the PII/PHI of Plaintiffs and Class members to: (a) escape and

22   spread from its normal place of storage through unauthorized disclosure or release;

23   and (b) be accessed and acquired by unauthorized parties in order to view, mine,

24   exploit, use, and profit from their PII/PHI, thereby breaching the confidentiality of

25   their PII/PHI. Plaintiffs and Class members have accordingly sustained and will

26   continue to sustain actual damages as set forth above.

27       131.   Plaintiffs and Class members were injured and have suffered damages,

28   as described above, from Defendants' unauthorized release of their medical

BLOOD HURST & O' REARDON, LLP

00208825

information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and are therefore entitled to nominal damages of one thousand dollars ($1,000) for each violation under Civil Code § 56.36(b)(1), or the amount of actual damages, if any, for each violation under Civil Code § 56.36(b)(2).

132.   Plaintiffs and Class members also seek reasonable attorneys' fees and costs under applicable law including Federal Rule of Civil Procedure 23 and California Code of Civil Procedure § 1021.5.

<div align="center">

**COUNT VII**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL")**

</div>

133.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

134.   The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendants engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

135.   In the course of conducting its business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and Class members' PII/PHI, and by violating the statutory and common law alleged herein, including, *inter alia*, the CCPA, Section 5 of the FTCA, HIPAA Privacy and Security Rules, and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiffs and Class members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-

00208825

BLOOD HURST & O' REARDON, LLP

described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

136.  Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII/PHI and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CMIA, Article I, Section 1 of the California Constitution (California's constitutional right to privacy), HIPAA Privacy and Security Rules, and Section 5 of the FTCA. The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

137.  The UCL also prohibits any "fraudulent business act or practice." Defendants' nondisclosures and misrepresentations regarding the security of Plaintiffs' and Class members' PII/PHI and their inadequate data security were false, misleading, and likely to deceive the consuming public in violation of the UCL.

138.  The injury and harm that Plaintiffs and Class members suffered was the direct and proximate result of Defendants' violations of the UCL. Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data

32

00208825

Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) loss of value of the PII/PHI that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

139. Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiffs, therefore, on behalf of themselves, Class members, and the general public, also seek restitution and an injunction prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII/PHI entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of the Class, by and through undersigned counsel, respectfully request that the Court grant the following relief:

A. Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiffs as class representatives and undersigned counsel as class counsel;

B. Award Plaintiffs and Class members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C. Award declaratory and injunctive relief as permitted by law or equity to assure that Class members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D. Award Plaintiffs and Class members pre-judgment and post-judgment interest to the maximum extent allowable;

BLOOD HURST & O' REARDON, LLP

E.      Award Plaintiffs and Class members reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Award Plaintiffs and Class members such other favorable relief as allowable under law or at equity.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: November 20, 2023

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
JENNIFER L. MACPHERSON (202021)

By:          *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
jmacpherson@bholaw.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW (*pro hac vice forthcoming*)
ANTHONY L. PARKHILL
  (*pro hac vice forthcoming*)
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312/621-2000
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiffs and the Putative Class*

00208825

BLOOD HURST & O' REARDON, LLP